We move to the second case this morning, that's United States v. Bloom. Mr. Goodman, may it please the court. The government failed to prove fraud against Eric Bloom under any of its three theories. The fraud case against Mr. Bloom is highly unusual. He never stole a dime from his firm or from any of its customers. In fact, he lost most of his wealth when his firm collapsed. No government witness had a bad word to say about Eric Bloom. These witnesses included the two managers, York and Logan, who calculated the daily rates and booked the loan. The CFO, Ms. Arana, the Chief Compliance Officer, Keel, who testified that Bloom has a good character for honesty and high integrity. The head salesman, Stittle, who testified that Bloom was always forthright and honest with customers. The key witness, of course, was not called. That was Charles Mosley. He was the head trader. He ran daily operations. The evidence showed that he was stealing from the firm. He pleaded guilty, cooperated with the government. He certainly would have been in a position to know whether Bloom was involved in any fraudulent activity, yet he was not called as a witness. The government proceeded on three complex theories of fraud. The first was that Bloom committed fraud by manipulating customer rates to favor certain customers over other customers. Why he did this was not made clear in the record. In fact, it had no conceivable benefit to Mr. Bloom. In fact, the faulty rates actually harmed the house account in favor of the customers. To make its case- I thought the theory there, counsel, was that the so-called-whether the house account and the so-called seg-3 accounts were being used to subsidize artificially high rates for the 125 or seg-1 accounts. That was the allegation, but the exact reason why that would have been done was not clear. Wouldn't that tend to make the seg-1 accounts look more attractive? And the seg-3 accounts look less attractive. Right. Yes. Wouldn't that require the proof of a motive? It's not required. No, I don't. It's not required. I know what you're suggesting. I'm not suggesting that it's required. I'm just pointing out- Why did they do it? Why did they do it? If it's illegal, what difference does it make? What I would say, Your Honor, is that there was no evidence linking-to the extent that there was faulty rates, there was no evidence linking Bloom to this problem. To make its case, the government told the jury that any discussion of the rates by Bloom was per se fraud, no matter how benign the discussion. This was a faulty premise, as we point out in the briefs. The calculation of the daily rates-first of all, it had to be done every day. It was a complicated matter. There were a lot of variables. There were a lot of different customer groups within the SEGS. The mere fact that Bloom was talking about where the rates were set with his employees was not evidence of fraud. At best, the government's evidence showed that there was a problem with the rates, no question about that. It was brought to Bloom's attention, and he was slow to take action. This is insufficient as a matter of law to prove fraud. The government's second theory was that Bloom mishandled customer securities in various ways. I want to address the allegation that Bloom improperly pledged customer securities as collateral for what the government calls the house loan on August 13, 2007, which is the day that Bloom ceased operations. The government argued that this was the basis for his conviction on counts one through five. Here again, the government's case is based on a faulty premise. The government told the jury that pledging customer securities as assets, customer assets as collateral, was fraud. This was not true. First of all, it was not a house loan. Sentinel had a box loan that served both the house and customer accounts. At all relevant times, the customer's part of the loan was about three times larger than the house's part of the loan. Thus, it was both necessary and proper for Sentinel to pledge customer securities as collateral. But were customer securities segregated as collateral? Or did the bank insist on a collateral on all the securities held by Sentinel? The bank set up one clearing accounts where funds were commingled, house assets and- Right. So customer securities were pledged in part to collateralize loans for benefit of the house or for other customers, right? Well, what I would say is that what the evidence shows is that the house, at all time, it was heavily leveraged. There's no question. But at all time, it was never underwater. So the house always had sufficient assets to collateralize its portion of the loan. So what I would say to answer your question, Judge Hamilton- What's the point of segregated accounts? Well, the rules of segregation were spelled out at trial. There was some dispute over it. But the rules, in fact, I looked at them, the CFTC rules on segregation. But basically what the testimony was at trial was that segregation requires that Sentinel keep customer assets in the segregated account sufficient to meet its liability to those customers. That's the definition of segregation that's in our record. In addition- Did it do that? Well, there was no testimony about it. The only testimony was from Keele that there was regular custody audits and that the audits did not identify any deficiency. This case is, I mean, the company blew up nine years ago. Litigation has gone on since then because of the nearly $700 million shortfall. It sounds like you're telling us there was no problem. Well, the reason for the shortfall, Your Honor, the reason the company collapsed is quite clear from this record. The Sentinel was heavily invested in corporate securities, as it was allowed to do under the rules. It guaranteed its customers daily liquidity, which means that if they got their request in by 3 p.m. Eastern time, they could have all of their money back. It lived up to its promises to customers for more than 25 years. In August, the testimony was that beginning August 9th, but before that there was turmoil in the market, but beginning August 9th, 2007, the securities market froze for a period of two weeks, meaning that no corporate securities could be sold, even the highest rated, triple A, double A. Under those conditions, Sentinel had no choice but to cease operations. Eric Bloom declared bankruptcy in order to protect customer assets. In fact, Judge Hamilton, no customer assets were lost in the collapse of the firm. What happened is that the bankruptcy trustee came in and took 16 months before he got a liquidation order. By that time, the stock and bond market had crashed. When the assets were sold, they obtained a much lower price. The Seg 3 account, I think, lost approximately 30 percent of its value, and the Seg 1 lost about 30 percent, and the Seg 3 lost something like 65 or 70 percent. Yes, the losses were huge, and I would submit that Eric Bloom is very much a scapegoat for these large losses, and I don't want somebody to blame. So what was the Bank of New York balance in early August? The numbers in, well, I have the numbers from August 13th, which was the day the firm collapsed. The loan, the total loan, the Seg 1 had none of the loan on August 13th. The Seg 3 had $249 million of the loan, and the house had $166 million of the loan, against house assets worth $172 million. The most clear misconduct with respect to pledging securities was committed by the CFO, Ms. Arana. On June 29th, while Eric Bloom was on a three-week honeymoon trip out of the country, she authorized the use of Seg 1 securities to collateralize the loan. This was improper, because at that time, Seg 1 had no part of the loan. Those securities should not have been pledged. The evidence shows that when Bloom learned of this on July 30th, he ordered it to stop, and in fact, those Seg 1 securities were removed and sent back. Bloom did authorize the use of Seg 3 securities, but as I told you, Seg 3 had, at least on August 13th, Seg 3 had almost $250 million of the loan. There is simply no evidence in the record that Eric Bloom ever authorized the misuse of customer securities to collateralize the loan. The government's third theory of fraud was... Bruce, if you could hang on just a second. Isn't there a problem with using so-called Seg 3 assets to collateralize a loan that's shared with the house? The SEC has its own segregation rules, doesn't it? The testimony was that they had a perfect right. This was like a mutual fund. The securities were not customer-owned. This was the testimony of Bjornsson, also supported by Kiel. They had a perfect right to take securities out of Seg, both Seg 3 and Seg 1. They were not customer-owned securities. To take them out and pledge them as collateral for the house loan or for other customers? Not for the house loan. Or mixing Seg 1 and Seg 3? That's the way it was set up. Yes, it would have been better if there were separate loans. But, Judge, this is the way the Bank of New York set it up. This is the way it was explained at trial. They set up one account for the loans. The government's third theory of fraud was that Eric Bloom should have foreseen the collapse of Sentinel, and therefore he committed fraud by accepting customer deposits during its final week. But as pointed out in the briefs, the evidence shows that Bloom believed Sentinel would survive. In fact, he had most of his wealth in the firm. It went down with the firm. He was told as of August 8th, which was the day before the market collapsed, that things were looking better. Also, had Bloom done what the government says he should have done, which is continue paying out redemptions but stop taking deposits, he would have violated his fiduciary duty to the pool. And we cite in our brief the case Goldstein v. SEC. The government doesn't respond to that argument. I guess I don't know. If the company had sufficient assets on hand to redeem security or redemption requests, as I thought it was supposed to, I guess I don't understand why that would be a problem. I'm sorry. Could you say it one more time? If the company was supposed to have on hand marketable securities available to meet customer redemption requests, right, so if they were complying with that obligation, I don't see why they would have to continue taking in new deposits in order to meet those redemption requests. I don't believe that that's correct, that they were required to have funds. They did have a reserve account. It was somewhere around $113 million at the time it collapsed. It would not have been enough to meet all redemption requests. And, in fact, the testimony was that the loan, part of the purpose of the loan and why it was a benefit and marketed to customers, that we have this line of credit with Bank of New York, is that it allowed same-day redemptions without having to wait to sell securities in order to get the client funds. Judge, we recognize that we have a high burden on a sufficiency claim, but the government's case we submit in its most favorable light shows that there were problems that were brought to Mr. Bloom's attention, especially during its final month. He was sometimes slow to address those problems. This evidence might support a civil case for mismanagement but not a criminal case of fraud. And I would point out that the government in its brief cites not one case in response to the sufficiency argument. And, in fact, there is no similar case that we could find where these types of theories and this types of evidence was found sufficient to convict a person of fraud. I want to just briefly, because I see I'm into my rebuttal, mention some of the other errors, the trial errors. First of all, the district court erred in refusing to instruct the jury on the purely legal question whether Rule 1.25 permitted the use of leverage. Rather than give the defense instruction, the district court said the jurors will have the rule and can decide for themselves. I read what Judge Guzman said about it, and it is odd, but you all were the ones who approached it as a question of fact, right, by offering Mr. Bjornsson's testimony? Well, Bjornsson was called in rebuttal to the government's witnesses who testified as, first of all, I didn't see, for example, when Steitel mentioned Rule 1.25 and leverage, I didn't see any objection to that. The objection to opinion testimony? To his testimony about a question of law. I can't recall whether there was an objection. There was none. I can't recall. But three witnesses gave their opinion that the rule did not, I think there was, I do recall objections to witnesses giving legal opinions about Rule 1.25. It was error. The rule is five pages. It attacks that the jury simply was not equipped to give an opinion on that. And finally, the government's mischaracterization of its evidence and Bloom's defense denied him his right to a fair trial. And I'd like to save the rest of my time for rebuttal if I may. Thank you, Counsel. Thank you. Mr. Greenwald? Ms. Greenwald. Good morning, Your Honors. Defendant's primary argument is an attack on the sufficiency of the evidence, and that argument failed. Viewed in the light most favorable to the jury's verdict of guilty, the evidence was more than sufficient to sustain defendant's mail fraud and investment fraud convictions. First of all, the government alleged one scheme, not three different methods or portions of a scheme. It was one scheme. It was carried out through a series of alleged lies and omissions and false representations. And one of those involved the manipulation of interest. And defendant's claim here and in his brief that there was no evidence the defendant ever stole a dime from customers is just belied by the record. The evidence was clear, and certainly the government's position at trial and through our indictment was, that the defendant had these different portfolios, right? The 125 portfolio was for the FCMs, which was a low-risk portfolio. Didn't generate much interest. The prime, a little bit more. The house, high risk. So the prime and the house were generating much more interest. But most of their clients were coming from this FCM, these very low-risk FCM traders, you know, businesses, that were trading their clients' money for their own benefit, to get a little bit of interest over those margin rates that they could hold. So they wanted very secure investments for those. And the idea was, typically they would have invested them, I believe some of the testimony was, in treasury bonds. Things very secure. But Sentinel's pitch was, we can do better. We can do better than just putting this in treasury bonds. So come to us, because we'll protect it, we'll make sure it's safe, but we'll get you a little bit more interest. That's how they brought in this money. Well, the reality is, they couldn't do better. They couldn't do better, and the way they tried to show that they were doing better was by stealing. And it was stealing. Interest earned by the prime portfolio investments of the other customers, those seg-3 customers, whose were earning a little bit more interest. And certainly they also took money from their house funds. They definitely did. And that was Sentinel's insider funds. But the problem there in all of this, actually before I move on to that point, so to say they never stole a dime from customers is not true. It may not have gone personally into Mr. Bloom's pocket. He may have used it to attract more investments for his business. But he stole from his customers, and he stole for what he believed to be in the interest of his business. But what's more is he also needed all these customer funds going in to support this very high-risk trading that was going on in his house account. Because the house account never had more than $20 million in it, but it was investing in, at one point, had over $100 million of these CDOs, these very high-risk investments that generated a lot of interest. And yes, he did give a lot of those interest payments to the prime, and particularly to the 125. But that was all part of a rolling plan to kind of have more money in, to keep supporting this business, to keep investing, that maybe would have paid off one day in the future, but certainly did not. That's what the evidence here showed about what was going on and the manipulations that were going on. And the evidence of the manipulations, and Bloom's involvement in it, was overwhelming. The whole series of exhibits, 134, there's a disk that we actually supplemented the record in this case with every single exhibit between the two sides. So you have it all. But government exhibit 134 and 134A through Q are what the government was able to obtain of these spreadsheets. And you can't look at these spreadsheets without seeing, they're fraud sheets. And that's what Compliance Officer Keele, when he finally got his hands on the document that was created by the defendant, he created these master sheets that were then filled in by people. You look at it, and it shows interest actually accrued from these interest-bearing accounts in the different portfolios. Interest actually accrued that was entered off a computer by York or Logan as they testified. But then it shows how it was distributed. And on each of these sheets you see that there was monies taken from the SEG-3 and or the house, the prime portfolio and or the house, and given to the 125 portfolio. The government tells us, though, that Mosley was doing most of that. I'm sorry, say that again? The government tells us, or I'm sorry, the defense tells us that Mosley was doing most of that. Well, that was their position at trial. It was rejected by the jury. That was not York's testimony. It was that she also got information from Bloom. Instructions? Pardon me? Got instructions from Bloom? Yeah, that she would get the rates, which is what led to this whole convobulation, either from Mosley on most situations, but when he wasn't there, from the defendant. And moreover, starting October of 2000, I might have that date slightly wrong, but starting in earlier on in the scheme, either 2006 or earlier in 2007, I believe 2006, defendants told York, I want you to send me these daily sheets every day. I want to see exactly what's going on. You have the phone call that the defendant really takes out of context, and that phone call between Bloom, between the defendant and York, where they're discussing that one sheet, the, sorry, it's the July 30, 2007, taped conversation. And basically, York had completed the form showing the distribution of interest before she even spoke with Bloom. And she says to Bloom, well, should I move up the prime? Should I give them a little bit more? Should I give the 125 a little less? Mr. Bloom, defendant, doesn't say, I don't know what you're talking about. You've got to give them what the rates are. He says, no, I want the prime, I want the 125 to stay competitive. I want it to stay competitive with my competitors. So we can't move that around. And after that conversation, she sends him 134N, that exhibit, which shows on its face the distribution. So the evidence really is overwhelming on the manipulation. And in addition to all of that, the defendant admitted to Mr. Keel, his chief compliance officer, that this is what we've always done. We've always supplemented the 125 portfolio with the house or with the seg three. It's how it's always operated. And Mr. Keel went to him twice because it didn't change. And the defendant said, I'll look into that. But you know what? It continued right up until the day on, I believe, the last of those worksheets that we have in the record, might be 134Q or thereabout, is from August 10th, and it's right there. It's still months after his conversation with Keel and May. They're still doing it. The defendant knows it. It's part of how he's running this company. You know, the suggestion that the rates are complicated and that there was some complicated thing going into these rates, that testimony at 999 to 1001 is talking about the real rates, the true rates, the ones that are getting off the computer. York didn't know where these numbers, how Mosley and Bloom were coming up with these numbers because they were doing a fraud with these numbers, basically. Moving on to the other parts of it, the whole collateral. You know, York testified that as far back as 2004 and onward, she handled collateralizing that Sentinel Bank of New York loan at the end of each day, and there's a stipulation. I know Mr. Goodman said there was confusion over the segregated accounts. There's a stipulation in the record about how these accounts were handled, and basically when monies came in from the different seg groups, they were supposed to go into segregated accounts, but there was one account that was like a collateral account. There ended up being also a second one later on, some for Treasury, some for the rated securities. And the house securities did sit in that. They did. But when you collateralized it, when they used the customer securities for collateral, that's when they moved them into that commingled account. It's not like they were all sitting in there all the time. This was an intentional movement of customer securities, customer funds, to collateralize the loan. And not only does York say, if I didn't have enough to collateralize the loan, I would just move seg one, seg two, prime portfolio, the 135 portfolio customers. I'd just move them in there. And you know who taught me? Because I started to get trained by the person who was there before me, testified York. But she left before I really understood it. So when I had questions, when I had problems, I went to the defendant, and I went to him a lot. But beyond that, even in addition to York, you have the CFO, Arana. She was a certified public accountant. She'd been an auditor with the Chicago Merchantile Exchange. She'd worked for FCMs as chief financial officer. She testified that she told the defendant, or she knew prior to October of 2006, that customer securities were being used to collateralize the house loan, the house trading. And she put that in an email, and she sent that to the defendant. That's direct evidence. The defendant knew this was going on. That's before we even get to what happens when the repo counterparty starts sending back all these CDOs and the Bank of New York loan just escalates astronomically. And they can't use a lot of those CDOs. They can't sell them. They can't use them as security. And the bank will not release funds to wire out monies to customers until the loan is collateralized. So what happens? They use customer securities to continue to collateralize the loan, a lot of which has grown because of these house CDOs coming back from the repo counterparties. Now, the defendant makes much of the fact that he was in Africa. But during these months while he's there, during this 18-day period when he's there, he has constant conversations with Mosley, with his father, with Arano, with York, about what's going on, about these repos going back, about the loan going out of control. And, in fact, during one of these conversations on July 3, 2007, it's Government Exhibit 1406 at page 1, he's talking to York, all these CDOs have come back, and York tells the defendant, well, I've got enough in collateral at GSCX for the loan. Well, GSCX is the account that held treasury agency securities that were largely customer securities. What's more, the defendant makes much of him, of the defendant, you know, directed on July 20th that York and Arano move 125 securities out of the collateral accounts and only use securities belonging to the prime and the house account. And the defendant says, he argues here today, that the use of prime portfolio securities was proper because it was a large part of the loan. Well, that's really not supported by the record because if you look at, and I'll cite you to the exhibits, if you look at Sentinel's internal documents, they show that the Porsche, for example, Government Exhibit 628 shows, and 637, show that as of July 27th, the loan was about $348 million, was allocated to the prime portfolio. Sorry, the loan was about $348 million. Of that, $197 million was allocated to the prime portfolio, yet they've moved securities totaling $289 million into the collateral account. Similarly, on July 30th, July 31st, these are the dates that they moved $289 million of prime portfolio customers' collateral security to the collateral account to collateralize the loan. And these are, by the way, Sentinel's internal documents, just allocating the loan to the prime portfolio. But to the extent it does that, it says that the prime portfolio has $210 million of the loan or $204 million of the loan, but they move in $289 million of securities. So even by their own records, even by their own argument, they are using customer securities, prime portfolio securities, to subsidize, to collateralize the house loan. And really, those numbers, their allocation of numbers to the prime portfolio, is really suspect to start with, because the reason this loan is escalating, the reason it's going up so high, is because these CDOs are being returned. That's house securities. Those securities are too risky for any other account. But the other reason defendants' argument about these prime customers, prime portfolio customers' fails, is because these customers were also promised, customers like Mr. Barker, who testified at trial, they were promised minimal risk securities. Yes, a little bit riskier than 125, but the defendant personally told Barker, we use this loan from the Bank of New York solely to allow for short-term, overnight, just to make redemptions, not to leverage accounts, not to be able to keep leveraging and buying more stock with the loan money. The failure to disclose and concealment of Sentinel's financial crisis as they approached insolvency, that whole aspect of the fraud is really covered fully in our brief. The only thing I would say is that the defendant is incorrect in his belief that the fraud alleged was based on the defendant continuing to accept customer deposits during this time. It was based on his continuing to accept customer deposits without disclosing these material facts that were going on with the financial situation of the company, all of which were important to the customers. Ms. Greenwald, could you address the Rule 1.25 issue? Yes, of course. That was my next point. Very odd. So the defendant was not charged with violating Rule 1.25, and as the ‑‑ I'm sorry, Your Honor. Go ahead. As the district court judge recognized, really what this was all about was what were the parties' understanding? And the witnesses testified. Their understanding was that whatever, whether technically it's a violation of Rule 1.25 or not, the understanding of these witnesses based on representations directly from the defendant, based on their marketing materials, based on what the understanding was of Sentinel's own chief of sales, was that they weren't going to leverage these accounts. They were looking for minimal risk investment. Regardless of what 1.25? I'm sorry? Regardless of what Rule 1.25 meant? Regardless. And moreover, even ‑‑ I understand that, but I also see, for example, in the rebuttal portion of the government's closing, a lot of counterpoint on the factual issue of whether Rule 1.25 prohibits leverage or not and why the jury should believe the victims instead of Mr. Bjornson, and it doesn't look like such a small issue. Well, you know, I would say that even ‑‑ I mean, certainly the defendant tried to make that an issue. I mean, that's why it wasn't dealt with in our opening. But even if the posture of our position had always been that it didn't matter really technically whether it was or wasn't, and you shouldn't believe, you know, what Mr. Bjornson is saying because, you know, the rule really wasn't what was at issue. And even under Mr. Bjornson's, I hope I'm saying his name right, even under his testimony, it didn't allow, even under his testimony, it didn't allow Sentinel to use customer securities and repo agreements for the benefit of the house account. So even if Rule 1.25 permitted leverage in accounts, it didn't approve that leverage to be used for the benefit of another account, and that really was the thrust of the case. And really the thrust of it was, and I just don't think even if we misspoke in argument in the heat of a rebuttal argument, that it really changed the thrust of the case, which really was what representations were made to the defendant, you know, to these victims. And the representation was this will be a low‑risk investment. So, but even beyond that, Judge, there was just no basis in this record for the court to have instructed that 1.25 permits it. It would have been misleading to the jury to have said that. One, because it would have made it seem like 1.25 was the issue, but moreover, the fact was, even if 1.25 permitted the use of leverage, it didn't permit the use of leverage for the benefit of Sentinel. Can I ask you just ‑‑ Yes. There's a point in the reply brief. Yes. It's page 9. Yes. The defense quotes Mr. Wasserman from the sentencing affidavit. Yes. Yes. To say that an FCM must at all times have enough funds in customer segregated accounts to satisfy the FCM's financial obligations to all of its customers who entrust the FCM with funds for purposes of trading on U.S. futures exchanges. Close quote. Okay. And then the brief asserts there's no evidence in the record that Sentinel ever breached that obligation. Do you agree with that? No. I mean, the FC, I mean, Sentinel did not keep good records. I mean, you can look at the records, all of which we submit, and this was not a beautiful record company, at least what we were able to obtain. So as I stand here right now, Your Honor, I can't point to or know that that's exactly there. But here's what I can say, is that they promised in their ADV agreements, in their agreements with the, I forgot what they were called, the management agreements, that customer funds would be kept segregated and that in the event of bankruptcy of Sentinel, no lender would have an interest in those customer securities or customer funds based on Sentinel's debt. And that's what the parties understood as to segregation. And that's what was relevant for trial. None of this came out at trial, really, about whether there were enough funds in separate things. But the reality is Sentinel did not have enough money in its house account to cover its debt. It didn't. And to the extent the debt was put off on SEG-3, it was largely not a matter of overnight loans to redeem, as had been represented, and not in the context of minimal risk investments, as they promised, even to SEG-3, even to the prime portfolio. It was in the context of high risk or higher leveraged than had been promised trading. Thank you, Counsel. Thank you, Your Honor. How much time? Three minutes. Thank you. On the issue of the Rule 125, first of all, it's simply not correct to say that the defendant made that an issue. It was mentioned by the government in opening statement on page 45. The government clearly made the case that he was cheating. He was boosting returns by illegally using leverage in violation of Rule 125. Three witnesses were called to make that claim. Bjornsson testified in response to that evidence. And the government took no position at sidebar as to whether Bjornsson was correct, but told the jury to disbelieve him because he had been a paid consultant at some point for Sentinel. Secondly, Ms. Greenwald's statement that York would sometimes get the rates from the defendant is simply not true. If you look at the call transcripts, the smoking gun that the government relied on at trial was July 30th. The government had almost an unlimited universe of phone calls from the Sentinel trading desk. That's the call that the government pointed to as the best evidence of defendant's manipulation of rates. But if you look at that call, what it shows is the defendant asks York to explain her calculations. She does. He makes some comments about them and tells her to leave them as she calculated them. If there's any ambiguity, York testified that the call was absolutely innocent, that Bloom didn't ask her to change the rates. Are we talking there about the rates as calculated for allocations to customers or as actually earned by the customers? As calculated. The rates were based on a pro-rata interest in the funds, and yes, the rates were out of balance. If you look at those rate sheets, it shows that they're out of balance. However, there is no testimony that Bloom ever encouraged that. In fact, Keel's testimony was that Bloom didn't want that to happen, that he was urging people to stop it. If you look at the emails which we cite in the reply brief, it's clear that he's telling York that he doesn't like that. He wants it to end. I just want to mention some other things from the government's closing argument, Your Honor, and I hope you'll take a close look at this because the government's point is basically he knew about it. That's simply not enough to convict somebody of fraud. Closing argument, repeatedly misled on the July 30th call. It was an entirely innocent call as the witness testified, yet the government told the jury that this was Bloom manipulating customer rates and committing fraud. They told the jury that all the account statements on July 30th are false and that those counts of conviction, they must convict on counts 13 through 17. That was a false argument. They told the jury that the July 17th call, which was an absolutely innocent call, was fraudulent. They told the jury that his defense was desperate and pathetic. They told the jury that he was like a rat leaving the sinking ship because his father had taken his funds out in the summer of 2007, something that Bloom had absolutely nothing to do with. These were indefensible arguments. This was a close case, Your Honor. We suggest that he was denied a fair trial. Thank you very much. Thank you. Thanks to both counsel. The case again is taken under advisement.